Good morning everyone. I'm Judge Park. I'm here with Judges Walker and LaValle this morning. We have five cases on the calendar for today. I understand that all counsel are present, so we can dispense with calling the calendar. Two of them are on submission, so we have three arguments, and the first will be in case number 20-4278, United States v. Constantine. Thank you.  Good morning, Your Honor, and please support me. This is a case where the appearance of justice is not to be met. This is the only case that I know of where the government failed to produce enough evidence before trial that it continues to have that evidence in its possession, and that it will not turn that evidence over to the defense. And that is raising questions about the fairness of this trial. People are asking what is it the government has to hide, and they want to know why Mr. Constantine should go to jail for 10 years when the government holds potentially exculpatory evidence in its hands that has not yet been proven. Can we just clear up the facts right now? I've got different versions in my head. I take it that there was the system whereby there would be a taint panel, and all the documents that were seized from Kenner in his phone and computer were supposedly turned over to the taint panel, and Kenner himself, of course, got everything. They were his documents. The documents for Constantine were turned over to the taint panel. The taint panel did their review, turned over the remaining documents that were not privileged to Constantine and to the government and to the prosecution team, right? That's how it should have worked. Well, that was the theory, and that was the representation of the government at the time. Yes. Okay. And then later on, there were 90,000 or 89,000 e-mails apparently that were not turned over. Is that a fact? Is that clear? Or do we know whether any of those were turned over? Yes, we know that's a fact that it was not turned over. So the taint team did what it did. We were sent two letters from the government saying we are providing you with the text messages, and they did provide us with millions of documents. And there were some text messages among them, what we're calling the bubble text. And these were text messages that Kenner would have gotten on his phone, but he forwarded them to his computer. And so they pulled these texts off the computer. There's only a couple dozen of those. So the ones that were on the phone were not turned over to them. Right. They should have been. The ones that were non-approval should have been turned over to us. So we were seeing that we got some text messages, but we had no idea how many text messages Kenner had sent. So we thought we would give them all. We saw we got what seemed to be all. We had no idea. And at trial, we learned that they weren't. Kenner used some of them at trial that he had on his own. And that, when it first came up, we were surprised that maybe the defense thought maybe it had missed something. But then we came to learn after trial that it was a problem. Well, apart from that, Kenner also testified at trial, right? Yes. That there were these documents. Yes. Or texts. Right. And everything was electronic, am I correct on that? Yes. Okay. And then at that, and that was part of his testimony when he testified as a witness in his own defense. Yes. Apparently, you know, he was the main person that dealt with the investors. They traveled a lot to take down texts in a helpful way to communicate with them. But Mr. Huntsman, you know, we still haven't seen all the texts that happened between them. And the problem is that a lot of the texts that we do see, we know that they are potentially exculpatory. How do you know that? Well, because we see one of the bubble texts is one with Mr. Nordstrom. And it says – he's asking Mr. Kenner, you know, where am I buying this UFORA stock from? And he says, I'm buying it from Mr. Constantine. Right. And that's important because the government's argument is money comes in and then, look, Mr. Constantine takes it and uses it to pay his bills. Well, if they're buying Mr. Constantine's UFORA stock, Mr. Constantine has money to spend how he wants. The other example we have is Mr. Kenner printed off one of the – what we call the play texts, one of the phone messages that we never saw. And that involves this guy named Jamie Keaton, which we addressed in our brief. But he had dinner with Mr. Kenner and Mr. Constantine on one night, and they explained the pitch for investing in a global settlement fund. Two days later, Mr. – this would be a vest. And a week later, Mr. Constantine sent him an email saying, here's how all your money is going to be invested. And this came out at the trial. This – yes. All these here. Now – Well, we didn't – part of it did. I'm sorry. We didn't have the text message. Right. And so there was this litigation involving a key. And his testimony was, I was never told how this money would be spent until I got this email from Mr. Constantine a week later, so there was fraud. And the government tried to portray this email as a big cover-up that happened afterward. But we know from Kenner's text message, the night of the dinner, two days before the investment, McKee texts Kenner and says, now can you tell me again, let me discuss at dinner where this money would be spent. And Kenner laid it all out for him in the text messages. And then McKee says, that's great. Can you send me an email that summarizes this? He says, yes, I'll have Tommy do it. Mr. Constantine did it. So Mr. Constantine sent that email a week later. It shows that there was a contemporaneous record. And the government acknowledges – Wait. Hold on. Hold on. I just have one more question. Sure. So this all – the trial was in 2015, correct? Yes. April of 2015 or thereabouts? Yes. And you didn't move for discovery of these documents or for their production until 2019, correct? Well, we sought them before trial. Well, I know you sought them before trial. And the government said they'd turned over everything. And so you didn't – you weren't aware of the possibility that there might be additional documents that should have been turned over that weren't until the trial. I think that's what you're saying. Yes. And then – but at that point, why – you waited four years to make the motion. Why? I looked at the trial counsel below. Well, trial counsel. What I'm saying is that Mr. Constantine didn't discover until he started going through the post-trial briefings of Kenner that there were more messages that had been missed. Well, I thought that at the trial it was clear that there were messages that were missed. I remember seeing part of the transcript in which Kenner was questioned about this. Well, there were millions of documents. I think the defense counsel did not recognize some of them that they dropped. Some of the evidence was put past them. But one way or the other, even under the – the government has sort of asserted this theory that we should have figured out that it had been mistaken when they told us twice we had everything. And they said that on day four of trial. Well, that's their argument that – their argument that there was no suppression as a result of that. That's their argument, right? Well – No, no. I'm not asking for your response. I'm just saying what their argument is. Yes. But your response presumably is, well, whether or not we were aware of it, it wasn't in time for us to be able to make any kind of use of it at the trial. Right. It's truthful. That's certainly the first argument. It came on day four of trial. Certainly if the government had done 90,000 text messages – Yeah. – day four of trial, everyone would have a problem with it. But yet we still never received the text messages. So this is what we only know they exist. Now, as matters stand now, I see that you're sort of arguing that Brady requires that you seal these documents. That's what you're arguing. Well, Brady requires that we seal all the documents so that we can assess materiality. Well, that's not normally the way Brady works, is it? It normally works that the government has the responsibility of producing Brady material. If they have Brady material at any time before or after the trial, they're under a duty to make it available to the defense. And that duty continues after a trial, indeed, after a sentencing or after appeal even. Right. So it could be the basis of a habeas motion. It could be. I mean, in our view, this is essentially a trumped-out situation where the government never receives the evidence. But how do you get from the government's duty to turn over Brady material to the fact that you're entitled to all of these documents now, simply because you should have gotten them before trial because the government offered – was supposed to turn over everything or said they were going to turn over everything? They didn't have a duty to turn over everything. Well, they did have the duty to turn over the phone records. In fact, they told us they were going to do it. I know they told you. But was that a duty or was that just the government being extra gracious, if you will? No, I think it's a duty because this is a broad case, and that depends on what can or can't hold the investors and where their money would be spent. And so we have to look at it. They sold the obituary value. Where does the duty arise from other than Brady? It arises with Brady. I see. That's the duty you're talking about, the Brady case. Yes. I mean, there's a sort of a core in Brady. But that's not a general duty to turn over everything. It's a turn – the duty is to turn over Brady material, exculpatory or impeachment. Well, so we've come to examples now, like in the key text messages we never saw that we know that is exculpatory. And that's one example. Right. That's just one, and that's true. It shows that it's of the type, that this 90,000 that we haven't seen are. So I think we're entitled to at least see it. But if not, and if we don't see the evidence that it's been lost or destroyed, you ask whether it's potentially exculpatory or potentially useful. And here we know that it's at least potentially because the one example we have is actually exculpatory. Right. Now, this whole argument that you're making in your brief was presented to a motions panel of this court. Yes. And the motions panel didn't agree with you. Right. Did not turn it over. So in effect – but you didn't move for a reconsideration of that. And it was almost contemporaneously with the appeal and the briefing in this appeal. You decided to go ahead with the appeal. But this appeal effectively is a – would require reconsideration of the decision in that case. It's effectively right, Your Honor. I mean, this court itself has resigned from being an H.R. block. The motions panel decision is essentially provisional. And the court said it passed by the Department of Transportation. And their panel may revisit a decision by a motions panel. So we view this as essentially the reconsideration argument that we think we have. And it's doubtful here. The text – the only way the text message is on day four of trial and not on a receiving end. Right, right. That would give us essential evidence we need. And there's no way to assess how overwhelming the evidence is by only looking at what the government chose to produce. So a question I have is, is there – does the law of the case come into play here? No. No, Your Honor. This court rejected the law of the case of the Rosado in a B.H.R. block decision. That's 182 F. 3rd 144. 182 F. 3rd 144. Essentially, the court explains that a motions panel decision is provisional. The merit panel can only revisit it. And, for example, in Arauzuga v. Piros, 781 F. 3rd 29, a motions panel dismissed a claimant. And the merit panel reinstated it. And there's a number of examples where – Give me that citation again. 781 F. 3rd – 782 F. 3rd 29. Another is Sheriff of the United States, 689 F. 10x 18. A motions panel dismissed a claim with prejudice, and the merit panel modified the order to dismiss it without prejudice so that an equitable tolling argument can be made. But there's a number of examples in which this court has had a merit panel override a decision made by a motions panel. So what is the relief you're seeking here? You're seeking a turnover? Well, I think we would be presenting an alternative. I think under Trumpetta, we would say we never saw the evidence, so we should look at whether it was potentially exculpatory, and we say it was. I thought that Trumpetta dealt with evidence that was lost or couldn't be found. Here, we've got it. Right. I agree. That's not the situation if the government is able to produce it, but we're left in the same position. The problem with the Trumpetta rule is Brady is unfair in requiring us to show materiality of the document we've never seen. And so if the government has destroyed the document, then we ask, well, is it potentially exculpatory? That's good enough. It's effectively destroyed. We've never seen it. The alternative would be in order to produce the documents, we hand it to the district courts so that we can assess whether this is material or not. The district court can rule on that, and then we can bring it back up to you if there's a dispute. Now, is there anything that prevents you from raising all of this in a habeas motion? I mean, there's an issue that we have it live now, and Mr. Constantine is in jail. So to go through the process of a habeas when we have a dispute before the court can address it now would seem unfair. By the time that would sort itself out, he would have spent potentially years in jail on a conviction which would be innocent. Would there be any – would you seek to have a hearing at all, or are you just – you'd be willing to go on the basis of what the record is at the present time? Well, that's – you know, our motion that we submitted to the court that was the motions panel cited a number of cases from this court where this situation arises where material evidence wasn't produced, it was thought loss, it was found, and the court retained the jurisdiction. We may ask for an evidentiary hearing in order for it to be produced so that we can filter the evidence. Yeah. And if the district claims none of it helps us, we'll walk away. What do you do – what do you do with Judge Bianco's finding here that this evidence is not material? What's your response? Well, he made an assessment of evidence he never saw. And so I think when he saw what he saw and he said what the government chose to show me, it was overwhelming. But then it starts to be like that whole show, you know, in the rest of the story with Paul Harvey. You know, it's like the government had always opened its case and at the end of its case – You're basically saying that there's a problem with the fact that he said it wasn't material, but he doesn't – he doesn't know what it is. Right. So – so how – you know, he's – he's basically saying nothing in that – in that evidence could possibly be material. But how do you know? And what we found out is that as it happened – and the truth is, in the end, he was a star witness for the government, and he's pretty much destroyed by the text messages. Yeah. It was completely undercut. And they could hold back one message, and that's true. But we need to see the other 89,999, and who knows what's there. But it's certainly unfair with this cloud over this case to allow Mr. Crosby to spend 10 years in jail. Yeah. Okay. Thank you, counsel. Now, excuse me, I have another question. So how does Rule 16 play in – in your contentions here? Well, I mean, I think all these materials should have been produced under Rule 16. You're talking awfully fast with the mask covering your mouth, so you have to wear the mask, but you don't have to speak so fast. Okay. It would be easier to understand you if you slowed down a little bit. I mean, I think the obligation largely rises under Brady, but under Rule 16 we think they should have produced the evidence, and there really wasn't a debate about that. The government told us they were producing the text messages for us. There was transparency that they were sending it to a team. There was transparency that they were telling us, here are the text messages. They're underprivileged. We got some text messages in the bubble form. So we have no reason to know there weren't another 19,000 text messages out there. It seems to me that at least arguably Rule 16 uses the word material, but it seems to me that the word material has a different meaning under Rule 16 than it has under Brady. Under Brady, material has to be exculpatory or at least something pretty close to exculpatory in order to give rise to an obligation. Under Rule 16, the item is material. It seems to me anything that could conceivably be of any use to the defense is material. Yes, Your Honor. And I can say part of the difficulty here is we're working in a vacuum because we don't have the evidence before us. And another thing is the government had it before us either. When Mr. Kinnard began introducing these evidence, Ms. Kilmonger already objected because she didn't know where the evidence had come from. So it sounds to me like no one actually did a materiality review of these 19,000 documents. Okay. Thank you, counsel. You've reserved a minute for rebuttal. We'll hear from the government. May it please the Court, the Supreme Court, the United States, and also the Tribal Council below. A question at the outset. Is it correct that the government has refused to turn over the e-mails that were not produced? Your Honor, the text messages that were not produced, first of all, it's not true that they were not produced. That's one factual correction I want to make. Second, we understand that those text messages are entirely in the possession of Mr. Kinnard. As for Mr. Constantine, they may be in his possession if they were partly not. I'm sorry. I thought the FBI had the materials. Your Honor, the FBI has the original devices and extractions of the original devices. No, but I thought there was a period of time when the government said there are no more materials. And then there was a thought at one point that they were lost. And that was the basis for the motion that is now, I think, mooted on that score. But there was still – and then there was a disclosure, I think, kind of at the 11th hour in the briefing here in this case, that, oh, no, we have the documents. Now, are there – is there a drive that the government has in its possession that has documents on it that may or may not have been produced? There is in the FBI's possession. That's – okay, wait. Let me just follow through and understand this. So in the FBI's possession, there is – there are documents. And you think we don't know that those documents weren't produced, right? Correct. But you don't know that they were produced either. You can't – you can't make a representation to this Court that every document that was seized at the time that Kenner's devices were seized have been turned over. Everyone has been turned over except Kenner. Yes. That's got nothing to do with it. No, we're not talking about Kenner. I can't. And everything that's provided for the review was turned over to the prosecution team. Right. But that doesn't satisfy – because Kenner may have more documents than the taint team or the review team got. You don't think – in other words, are you still representing that everything has been – every document went to the taint team and that the taint team pulled out the privileged documents and all non-privileged documents have been turned over to Mr. Constantine? Are you saying that? Because that isn't – that isn't what I understood from the record. I want to be absolutely clear. What we're representing is that we took all of Kenner's devices that were seized and provided them to the taint team. The taint team did their review, and whatever survived that review, which involved some back-and-forth with Kenner's counsel, was then provided to the prosecution team, the trial team, and Mr. Constantine. Do you know whether the taint team turned over everything that was not privileged to – or might they have mislaid or kept something aside? Your Honor, I have no way of knowing that. Exactly. Exactly. So we don't know that. And there's apparently 90,000 – the other side is saying there are 90,000 emails or texts that they have not received. Your Honor, I think it's important to recognize that there are two constraints at play here. One is the search is, of course, governed by the requirement of the honor, attorney, client, and privilege. It's also governed by the Fourth Amendment. Under really Fourth Amendment law, and in particular, Judge Bianco's ruling in this case, that we needed to conduct a two-step process. We need to not just – the first step was – So your defense here is that to take these materials now and turn them over would violate Mr. Kenner's Fourth Amendment rights? Your Honor, it's clear. I think that's – it's interesting that the government is raising his rights. What about Mr. Kenner? Has he spoken up on that? Has he filed an affidavit to that effect? Mr. Kenner has litigated this since the outset of the litigation. Mr. Kenner at first claimed that we should actually not have a phone or computer in our possession at all. This isn't the first case that this has happened in. I've been reading lately in the press about the Ng case, right, the Goldman Sachs case. Yes, Your Honor. And that involved a huge number of documents that were never turned over. And it's caused a big disruption in the prosecution. Your Honor, there's a different issue, a slightly different issue, which is there there was – there were certain documents that were supposed to be pushed over that were not. Here we have a different issue, which is there's two levels of purview. One is to separate privileged from non-privileged. But even after the non-privileged materials come over to the prosecution team, it was our obligation pursuant to the warrant to only see a subset of that. We obtained the non-privileged materials approximately two months before trial. We provided a copy to Constantine right away. Then we started our review, and it's discussed at a status conference of everyone present, including the district court and Constantine and his counsel. The strategy from Constantine was to demand at that point that we tell him exactly that we might lose that trial and not ask for a return. I'm not blaming the prosecution team. I'm not questioning the prosecution team here. What I'm questioning is whether there are additional documents that the prosecution team never had. It never came to the attention of the prosecution team. Your Honor, if that's the case, then they're not in possession of the prosecution team. Right, but they're in the possession of the government. They're in the possession of the government. And the prosecution team seized them. But, Your Honor, the Brady cases are clear that it's not the government. It's the prosecution team that has Brady obligations, not the government as a whole. Well, the prosecution team has the obligation to obtain all the documents that are relevant for the case from the FBI, from investigators, and so forth, with a view to looking to see whether there could be Brady materials. But in addition, for starters, these materials were seized by the prosecution team. They only went out of the prosecution team's hands for the kind of review that you're talking about. So it's not as if just by chance the Department of Agriculture had some documents that might conceivably be relevant. You seized them. Yes, Your Honor, even in the warrant to authorize the seizure, a privilege review process was set forth and approved by the rational judge. From the outset, these were – the prosecution team, by definition, is walled off by the privilege review team. And then, given there is an ongoing challenge, which I expect Kenner to review before this court in his upcoming appeal, that, in fact, that these devices as a whole should no longer be in possession of the government at all. And for their reasons, we should not be permitted to go back and review and pull materials that were not initially pulled. Well, you are raising – you are raising Kenner's arguments, making up Kenner's arguments as an excuse, I guess, or to try and fend off an order that would require that 90,000 – that would determine where these documents are and that they be turned over. Not as an excuse, Your Honor. I think we have to grapple with the reality that in a case with this many different kinds of rights to protect, there has to be a process in place that protects all of them. Yes, so that's very easily done just by giving notice to Kenner and asking him whether he has any objection to producing the 90,000 texts or whatever subset of them to Constantine. It's not very hard to do. Just because I did that, Mr. Kenner did not consent. What? Just because I did that, Mr. Kenner did not consent. I do believe he will maintain his objection. And my point, Your Honor, I think from the beginning – And what was the basis of his refusal? Did he furnish a basis? His fourth – I believe – I'm not sure if he furnished a basis. On the record, my expectation is that his fourth amendment claim, which he has maintained since the outset of this litigation, that the devices should not be searched iteratively, that they should not be retained by the government for an extended period of time under this court's original panel of opinion denials, which has since been vacated, but that issue remains open in the circuit, exactly the length of time and the extent of search that is permitted. The government, in this case, was transparent from the beginning about the procedure it was going to follow. We put the devices to a privileged review. We told everyone that Kenner has a full copy. Mr. Constantine was there when the text messages were admitted into evidence. He admitted one of them. He admitted one of them himself into evidence. Yeah, right. And so the fact that there's no claim until – and not only that, his counsel, Crossy Sandeman – Well, all I'm doing is trying to – I'm trying to have – get a straight answer from the government about where the documents are. That's all. And then – as a basis, and then we can consider this. We can consider the 40 years that were – they waited to make the motion and whether that is material to the analysis. The text messages are in a phone that is in FBI custody. There's also an extraction report of that phone in FBI custody. The prosecution team does not have access to those documents because we believe they contain privileged materials. But they are in FBI custody. So are you – what – So what's missing is a thumb drive with the subset that was extracted? In terms of the interim work product, what's missing is the – yeah, the thumb drive that the privileged team handed over to the prosecution team of non-privileged materials. But the thumb drive – is the thumb drive – is that what contains the $90,000? That's what – so I would – Apparently. It doesn't contain $90,000 because some are likely privileged. But that should contain not anything that survived the privilege review.  But wasn't there a moment in the trial when Kenner started introducing documents? And the prosecution team, you and your compatriots, were surprised. Yes, Your Honor. And tell us about that. What happened? Your Honor, during the cross-examination of the government's second witness, Michael Pecca, Kenner's counsel confronted him with a text message that appeared like a box on a blank page. We had not seen that text message before or anything like it. And we raised that with the court. We raised that with counsel. We asked under the rule of completeness that Mr. Kenner provide the full text conversation. Yes, we have. We denied that motion. But it was clear right there in the first week of trial at the outset that there were materials – and this was clear before. Okay. So – There were materials that the prosecution team didn't have. Correct. The defendant didn't have. In fact, at every stage in this case, the defendants had as much or more information than the prosecution team. No, I'm not – we're talking about, obviously, Kenner had. We're not arguing – this isn't Kenner's appeal. But Constantine is saying that he didn't get those because anything he got had to come through the prosecution team. And you've made very clear that you – that the prosecution – there were documents that the prosecution team didn't have. Correct? You just made clear of that. There are documents the prosecution team didn't have after the response of Mr. Pecca. Right. Well, was this – were these materials that were offered that alerted the prosecution at trial? Were they privileged materials that would have been screened out by the privileged team? I don't believe the text message between Mr. Kenner and Mr. Pecca was a privileged item. Right. So there's documents that weren't privileged that the government didn't have. Why does it take so – that's the whole basis for this argument. Why are you not – why are you not being – accepting that? Well, you're bound by the Fourth Amendment, but you raise – the government raises arguments all the time about why the Fourth Amendment has not been violated against the defendant. And he's making the position – Kenner's taking the position, apparently, that the And I guess, does the government always agree with Kenner on that? Yes, it would be violated. And you can point out the fact that you never argued against that? You're not answering my question. What did you do when he made the motion – made the argument about the Fourth Amendment protecting these materials? The devices for the purpose of reviewing the material to get things further warranted before trial, that would stop our search before trial, and that we would no longer – we would inspect the contents of those devices in any way that would retain them only for the purpose of authentication. But then – Right. So – and that material was ordered turned over, right, for the government? I'm sorry? You got that material after you made that argument, that you needed the material for trial. Yes. You got that. You got that. And then there was – there were other documents that were not turned over that were – he was claiming a Fourth Amendment privilege to you, and you didn't really care because you weren't going to use them. At some point, we had to stop our search, Your Honor, just after it was insistent. And rightfully so, that the search has to end at some point, and it shouldn't be an indefinite search or a term to a general warrant, as was the concern under the original opinion. So we did stop our search. No search is perfect, Judge. Every search – I understand that. Now, is the problem now that Kenner is claiming that his Fourth Amendment rights were violated by the seizure of these materials? Is that what stops you from turning these over to Constantine? Yes, Your Honor. All right. But now, that issue is going to be raised in – Kenner raised that argument in the district court. Yes, Your Honor. And it's preserved for his appeal. Yes, Your Honor. And his appeal is pending now. Yes, Your Honor. So when the appeal determines – if – let's assume that the appeal determines that Kenner's Fourth Amendment rights were not violated. At that point, will there be any basis for your not turning those documents over to Constantine? Your Honor, at this point, we don't have authority to search those devices. I'm not asking you that question. I'm asking you if Kenner's appeal is heard, and he raises the argument that his Fourth Amendment rights were violated by the seizure of his phone and the 90,000 messages and all kinds of other things, and that issue is resolved against him, and Kenner's case becomes final so that Kenner will decidedly – I mean, it will have been determined that Kenner's Fourth Amendment rights were not violated. At that point, will you have any reason not to turn over those messages to Constantine? I don't think so. At that point, what we would have to do, again, is to get authorization from a court to search the devices. Our search warrant is long since been completed. The authorization on the search warrant is long since been completed. Second, we would have to conduct another privilege review, which I do expect that some of those text messages are with lawyers and some are personal. All right. All right. But those are all things that can be done. I mean, you do have Brady – you do agree that you have an ongoing Brady obligation. The government always has an ongoing Brady obligation. It doesn't end with a trial. It doesn't end with the appeal. Yes, Your Honor. Of course, I agree with that, but Brady – And you have materials in your possession that Judge Bianco said weren't material, but he never saw them. He never looked at a document and said, oh, this is not material. He just reached a conclusion that it couldn't be material because the evidence was overwhelming against Constantine. Well, I want to correct the record in two respects. One, with respect to the McKee text that counsel raised, Judge Bianco specifically considered that series of texts in Kenner's post-trial motion. Right. But he's also ruled on documents that were not before him that they couldn't be material even if they were turned over. Because there are some things we do know about these text messages. We know, for example, that they're all with Kenner. We know that they – as a result of them being with Kenner and others, they cannot defeat or negate the conversations that Constantine directly had with investors he directly defrauded, like James Sardinia and Nicholas Pertello and – I'm not saying – I'm not saying that the evidence isn't overwhelming against Mr. Constantine or very strong against Mr. Constantine. I'm concerned about the way these documents were handled and the way these files were handled and whether there was a complete investigation. To me, it's amazing to have – to think that there might be 90,000 texts that relate to the subject matter of the frauds here that were not turned over and were not privileged. First of all, I don't think there's a basis to think that all 90,000 relate to the subject of the frauds here. Okay. Let's cut it down to 10,000. Fair enough. Does that make it better? Second, your Honor, again, this – the entire procedure that the government followed here was not under the supervision of the court and on notice to defense. At all times, Judge Bianco found not just that the texts were not material. He also found that they were not suppressed because from the outset, Constantine and everyone else were letting notice that the government had seized this phone. It was undergoing a privilege review. They got the results of the privilege review. They knew it didn't contain all the contents. When they saw the text entered into evidence, they didn't ask for more. They actually cross-examined the government computer expert and pinned him down to say, this phone has the entire text message, but you don't have the entire text message. They made it a point. They made it their defense to argue that the texts were incomplete. They didn't want the complete version, and that was the strategy that they chose. It was the same strategy that they chose with the Home Depot recording in which Constantine confesses to being part of a bank robbery. So I think at all times during the pretrial and the trial, Constantine knew exactly what he had and made a strategic decision not to demand it. They weren't blind. There was nothing being hidden here. The court and the defense attorneys and the defendants knew exactly what we had. They couldn't make a demand to do their own search of the phone, to form a special master and do an independent privilege review. They couldn't make any kind of discovery demand. And in fact, with other evidence, they did. What would be the problem with an order from this court requiring that all of the documents that have not been produced and not been found to be privileged, all of the documents minus the ones that actually were turned over, now be turned over? What's the problem with that? Why would that be a problem? Do you follow me? I do follow you, Your Honor. Again, I'm concerned that we are constrained by Kenner's Fourth Amendment rights. Yes, but that can be handled simply by waiting until after. I mean, supposing that it was just as Judge Walker said, but that it was to be done after a determination that Kenner's Fourth Amendment rights were not violated. If that's in fact true. I have some skepticism about whether that would be the result, but I guess we could take it one step at a time. You're saying that Kenner's Fourth Amendment rights may have been violated? Is that what you're saying? I'm saying that Kenner's argument that a reiterative, indefinite search is not supported by the Fourth Amendment is one that is an open question in this circuit. So you're saying that it's like an open warrant, and the warrant specified materials that were related to the particular crimes, and that this is too broad. Exactly, Your Honor, because this would invite the government. It would become a general warrant. Right, okay. Then that might be an argument that could be made, but we have to see the documents, or somebody has to see the documents to see whether they're relevant, not relevant, and whether, I'm not saying they necessarily would be turned over to Constantine, they could be turned over to the district court, or to a special master the district court might appoint or something. It just seems odd that there are approximately 90,000 documents in issue, maybe less, maybe 10,000, maybe whatever, but nobody has seen them to know whether they are, could contain Brady material, and yet rulings are being made that they couldn't possibly be Brady material and that they, because they aren't material. I think what's confusing, Your Honor, and perhaps this all happened in 2015, and the tendency of Judaism and the reconsideration of Judaism is very much present in everyone's mind, and what's interesting is that Your Honor's proposal is basically the opposite of what the court said in Gnaeus in the original panel opinion, which is Your Honor is proposing that we go intentionally, go look at the non-response material, material that was not called out from the warrant years after the search is over and revisit it for some purpose, which is exactly what Gnaeus prohibited, which is why we don't feel free to do. Well, a moment ago you were arguing to us that the inhibition came from Kenner. It comes from Kenner's Fourth Amendment claims. Yeah, but once Kenner's Fourth Amendment claims have been set to rest, if indeed the result will be that, I mean, I can well understand that Kenner does not want to consent now as long as there's a hope that he has, can achieve a favorable court ruling because of the seizure of those documents, and he doesn't want any of them to be turned over. He doesn't want anything to be done that might somehow impair the force of his Fourth Amendment argument, but once Kenner's conviction has been affirmed that his Fourth Amendment arguments have been rejected, even if they are rejected with acknowledgment that there was a Fourth Amendment violation, but that it didn't affect the result of the trial, Kenner at that point may well no longer have any interest in objecting to the revelation of these documents to Constantine. So even if the Fourth Amendment issue is resolved in Kenner's favor, it still may result in the removal of any reason for Kenner to object to the turning over of the documents to Constantine. So what problem is there? I mean, if our determination were to hold this in suspense until the resolution of Kenner's appeal, what problem would there be in that, and then directing the government to turn them over assuming Kenner no longer objects after the resolution of Kenner's appeal? I think that there's a lot of stuff there, Your Honor, and assumes a lot of outcomes that I can't assume. It doesn't assume any outcomes. It simply says if the outcomes come out a certain way, to follow in that fashion. I understand. I think, Your Honor, the record is… Is that objectionable? I don't think it's necessary. Because the record in this case is sufficient that the text cannot be material. I don't understand that step. How do you show that they're not material when you haven't seen them, we haven't seen them, nobody has any idea what's in those except Kenner? Because there are fraud counts that rest entirely on Constantine's exclusive interactions with certain victims. There are some, you say. Every single count can be supported by evidence, was supported at trial by evidence, independent evidence, independent of any of the victim's testimony that the victims were Kenner's clients for whom he would have had, might have had, sexist conversations. Every single count can be supported by independent evidence. And that's one of the things that Judge Bannon… You're saying that there is an inconceivable possibility that a jury could have found otherwise on the basis of the documents that you haven't seen? There's no reasonable possibility, Your Honor. That's the text. There's no reasonable possibility of a different outcome. Because Constantine admits in recordings, admits to committing fraud, admits that Kenner's a bank driver and he's a getaway driver. He admits to Privitello that he essentially laundered his money through Ron Richard's Iota account. The entire Privitello fraud is conducted with phone calls directly between Nick Privitello and Constantine and email changes reproduced in the government's appendix. And that applies to every count? The Privitello fraud applies to Counts 5 and 6 with respect to Counts 1. Count 1 is a conspiracy count. I thought Constantine's defense was that Kenner was the main actor here and that he was the one who was orchestrating things. Kenner was the main actor with respect to certain transactions, but not exclusively, and that was well-aired at trial by the defense. He was started out as the front man, but… So you're saying there's nothing in the… There's no way that any of these text messages could reinforce that defense? Your Honor, that defense is largely… That was not in dispute that Kenner was the front man. In fact, the government's opening stated Kenner as the front man. Well, maybe it wasn't in dispute that he was the front man, but whether he was so much in the front man that Constantine wasn't or something, I mean, you know, we don't know. We don't know what these documents say. Nobody's reviewed them. It's just… I've never had a case like this. Your Honor, there was no defense that Kenner was the front man with respect to Nick Privitello, for example. Constantine was the only one talking to him on the phone or email. Kenner was the front man with respect to some of his professional hockey player clients, and that was not in dispute. Those victims testified, they were cross-examined on that, and any additional text showing that he was the front man… So you say there's certain other victims that only Constantine talked to, right? Yes, Your Honor. Do we know that these text messages do not contain any conversations between Kenner and that particular victim or investor? Do we know that? I can't say for sure. You just said Constantine was the only person. But what do we know? What do we know? We don't have these records. Your Honor, if you know from the witness testimony, this is not a case built on a communications circuit of acting. Everyone here testified. Nick Privitello would not stand for days and testify that his communications were essentially entirely with Constantine. In fact, the jury appointed Kenner on those counts and held Constantine solely responsible because his entire communications were with Nick Privitello. And between the recorded calls and the bank records and the e-mails and the testimony of Nick Privitello, you have a complete story of fraud that Constantine himself admits to in those recorded calls. He admits that he never gave a 1.5 percent. The idea that there would be some new story to tell about how Kenner actually told the victims that the money for Euphora was in exchange for Constantine selling his shares, that was also a defense fully aired at trial. Kenner testified on Constantine's behalf. Kenner put forth that defense during his four days of testimony, and the government thoroughly rebutted it, put backdated transfer documents, and showed me that any stock sale was a farce. So the idea that Nick... I understand it's unsettling to not know what's in a particular body of evidence. But at the same time, it's not novel because those documents are not in the possession of the prosecution team. And in any case, there's more information out there about a case than is actually in the possession of the prosecution team. You make the decision based on evidence in the record. And any notion here that these text messages between Kenner and other people would affect the counts of conviction, given the overwhelming evidence over a nine-year trial that presented not just with Kenner and Constantine one or the other, but also Constantine looking on his own accord directly at fraud... Let me ask you further about that. One of the issues is that Constantine's claim is that he thought this money was his, that he's accused of having diverted the money to his own uses. And he says, well, as I understood it, that was my money because it derived from the sale of my stock to the people that Kenner sold it to. Now, this involves Euphora stock. Is that right? And your answer to that, if I understand correctly, is that he knew perfectly well that Euphora was nothing but a pile of garbage and it was worthless. And he cannot have believed that his Euphora stock was sold for millions of dollars on any basis other than fraud. Now, do you have statements by him to that effect relating to all the... Does Euphora... Are all the counts based on Euphora or only some? All the counts... So, object one, Euphora forms one of the three objects of the conspiracy count, count one. It also forms the basis for counts two through six, and Kenner also forms the basis for count nine. There's basically a three-object fraud that's going on here and Euphora stretches across all of the counts. So, did the evidence include statements by Constantine himself essentially acknowledging the worthlessness of Euphora or promoting fraudulent versions of what Euphora was? Yes, Your Honor. The evidence included a deposition which Constantine stated under oath that it wasn't really worth anything. It also included an email at the same time sent by Constantine to investors, which is the email evidence that counsel claims is a follow-up to the G-text. This email was prominent at trial. In fact, we introduced into evidence every single version of the email that was sent to the various investors in which Constantine claims that Euphora is a, quote, significant asset. On the one hand, he's saying it's worthless. On the other, he's saying it's a significant asset. At the same time, there's internal company emails from the company's CFO and COO saying there's a negative operating balance. We don't have any money. With respect to the stock sale theory, that theory was thoroughly rebutted by the testimony of Mark D'Ambrosio, who was Constantine's CFO. When asked to actually identify who owns shares in Euphora, he couldn't make it add up to 100. It kept adding up to more than 100 because it was a farce. There was no bookkeeping. It was a shell where Constantine was sent to put money in his own pocket and in Kenner's pocket. That was corroborated by the debated tax return, by operating agreements, the Euphora operating agreements that had conflicting numbers of shares for each individual. By Constantine's own bankruptcy petition, when he claimed he still owned 50% of Euphora, even though a trial had steered him by that time, he had disposed of it. And other records, like transfer documents, that, for example, Tyson Nash testified he gave me a transfer document saying this is now my share of Euphora, which my documentation, and right in front of me, backdated it. So the idea, all of these theories were presented to the jury. All of these theories were rejected by the jury because there was so much independent evidence, not just the victim's testimony, but so much independent evidence of Constantine and money over and over and over again. Even, for example, even his disclosure of rejecting the key, Judge McAvoy rejected that as exculpatory and actually argued that it's inculpatory because the text indicates in the key that there's some money that's going to an air park, but it doesn't indicate, and what they told no one was that the air park was bankrupt. They promised these investors shares in the air park. Meanwhile, they actually sold that air park to someone else entirely, Steve Bailey, who came and testified at trial. All of these people testified at trial that the assets, the significant assets that Constantine and Kendall promised him were actually in bankruptcy, were under foreclosure, and were all sold to other people, the investors, in this case, got nothing. In addition to that, what remained undisclosed across the borders, no one really disclosed this to you, was that Constantine used his money for his own rent, to buy his own home out of foreclosure, to attempt to buy Playboy from Hugh Mefner, to try to use it to attempt to fund a tequila company in Mexico. The government meticulously proved a number of different expenses. The government exhibit 80 has a chart of the different expenses that were paid in particular by victim money from the GSF, the Global Settlement Fund, and they're all pretty self-explanatory. There are lawyers, there are hidden independent names of law firms who called those lawyers to testify at trial. Constantine used victim's money to try to build a helipad on his backyard. None of that was disclosed. There's nothing that the text could possibly contain to refute this independent evidence of fraud. Thank you, Counsel. Thank you. Mr. Mann, you have a minute for rebuttal. I have a minute, so I'll try to be quick without talking too fast, but to go back to the Fourth Amendment issue, I think it's completely unfair. Mr. Constantine was entitled to the material from the phone at the time of his lawful leave, seized by a search warrant. After he was told he was going to get that, he should have gotten it. If it's now been held too long by the government, and they no longer have the ability to search it, you should treat it as a trombone situation where the evidence is effectively destroyed. So that would be the right position there. For the end, Ms. Comaretti starts going through lots and lots of facts in a very fact-heavy, long trial. But the point that remains is we don't know what is on the $90,000 text. And there may be particular accounts that she can argue to be strong enough... Can you just describe for me in, like, one or two sentences what your theory of what is in those texts that would make it material and exculpatory? I know you gave me some examples, and I'm not looking for that level of detail. I'm just looking for a description of how they could be exculpatory. But Mr. Constantine's view is that they spent the money the way that the investors knew it would have been spent. And he thinks that Mr. Kenner's testimony, what it would tell them, like what it told Mr. DeKeefe, how things would have been properly spent. And if not, Judge Bianco said that the investors had been standing and he lied and lied and lied. And so Mr. Constantine would be in a position to say, he lied to me, too. You know, that's how he spread me a lie... So that he didn't, Mr. Constantine, did not know what Kenner was saying and that, in fact, he was himself a victim. Is that the theory? Well, Kenner kept assuring him that this is all we ever know. I told these people this is how we're spending the money. And Mr. Constantine is upon the e-mails. And I think the fact that he's not on the 90,000 e-mails is indicative that he's being shut out of this process. He's the kind of, upon Kenner, who just knows about lying, lying, lying. So that his use of the money that he got was not knowing that it was fraudulent. Right. And he also, you know, he loaned money to Kenner. He loaned money to these investment vehicles. He was selling his own stock to Euphora, which, to this day, has tradable value. It's not a bad stock. And what he was saying at the time was it's a startup. Yes, it has no material value yet, but it's a great startup. And it seems to be doing well. I'm staying out of time, but I'm happy to answer any questions. Okay, thank you both. Thank you, Your Honor. We'll take the case under advisement. I do have one question. Do you know what the schedule is for Kenner's appeal? I'm sorry, Your Honor. I believe he was just granted an extension because he's filing a pro se.  Yes. Uh-huh.